ORIGINAL

FILED
MAR 16 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**J.H. PARKER CONSTRUCTION CO., INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

**Case No.** 07-183 C

**COMPLAINT**

COMES NOW, Plaintiff, J.H. Parker Construction Company, Inc. ("Parker"), by counsel, and for its Complaint against the United States of America, states as follows:

**JURISDICTION**

1. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. § 601, et seq.

2. This Complaint constitutes a timely appeal from a Contracting Officer's failure to issue a decision within sixty days of receipt of Parker's Certified Claim.

3. On September 26, 2006, Parker filed a Certified Claim with the Contracting Officer for the United States Department of Agriculture under Contract No. 50-4423-0-7990.

4. On February 9, 2007, counsel for the Defendant informed Parker that the Contracting Officer did not intend to issue a written decision on Parker's claim.

5. Therefore, pursuant to 41 U.S.C. § 605(c)(5), Parker's Certified Claim is deemed denied.

6. In accordance with 41 U.S.C. § 609(a)(3), Parker hereby files the instant action within twelve (12) months of Plaintiff's claim being deemed denied.

## THE PARTIES

7. Plaintiff, Parker, is a corporation organized under the laws of the State of Mississippi.

8. The Defendant is the United States of America (the "Government"), acting through its agency, the Department of Agriculture, Natural Resources Conservation Services ("NRCS").

## FACTUAL BACKGROUND

### A. The Franklin County Dam Contract

9. On or about March 17, 2000, the NRCS issued its Invitation for Bids ("IFB") concerning the construction of a dam in Franklin County Mississippi, ("the Project") for the NRCS. The dam is described as a High Hazard dam and at the appropriate time, Parker submitted its bid in the form required by the IFB.

10. On August 4, 2000, Parker was awarded the construction Contract contemplated by the IFB, which was identified as Contract No. 50-4423-0-7990, Franklin County Dam ("the Contract").

11. The Contract work included construction of an earthen embankment (dam) and a reinforced concrete baffle chute grade control structure, as well as other appurtenant features as specified by the NRCS, on Porter Creek in the Homochitto National Forest, located in Franklin County, Mississippi.

12. When completed, the dam was designed to be approximately 97 feet tall, half a mile long and 625 feet wide at the base, and to contain more than 1.8 million cubic yards of earthen materials.

13. The purpose of the Project was to create a recreational lake and related facilities.

14. Under the Contract, the NRCS provided Parker with the Contract's "design specifications," setting forth the specific dimensions, materials, manner of performance, and other requirements for Project construction.

15. Despite Parker's efforts, in the course of performing the Contract, Parker incurred delays and increased costs resulting from defective specifications, changes, differing site conditions, and the NRCS' failure to cooperate with Parker in good faith under the Contract.

**B. <u>The Concrete Cellular Block ("CCB") Defects</u>**

16. Included in the specifications provided by the NRCS, the Contract Documents specified placement of a layer of Concrete Cellular Blocks ("CCB") on the upstream slope of the dam embankment.

17. Immediately after Parker commenced placement of the CCB, Parker encountered and notified the NRCS of significant deficiencies in the design of the CCB system that ultimately resulted in a failure of the system to perform as intended.

18. After Parker first commenced installation of the CCB system in accordance with the NRCS' original design, the work was suspended from September 25 through 30 due to heavy rainfall.

19. Parker and NRCS representatives met at the site on or about September 30, 2002 to review the damage due to the rains and both parties found that the CCB system had completely failed.

20. Despite the CCB system failure, NRCS inexplicably delayed the redesign of the system and effectively suspended Parker's critical path work on the Project.

21. By letter dated October 1, 2002, Parker formally notified the NRCS in writing that the CCB system design was defective and requested an immediate review and correction of the design.

22. Parker also advised the NRCS that resolution of the design problems and installation of the CCB system was on the critical path of the Project.

23. Initially, NRCS denied that its CCB design was defective; however, the NRCS Contracting Officer's Representative and NRCS inspectors directed certain design changes in the field.

24. Based on the NRCS directed field changes, Parker again attempted to install the CCB system, starting on or about October 16, 2002.

25. On or about October 28, 2002, however, following heavy rains, the CCB system failed again and blowouts were found under the CCB layer.

26. Following the late October failures, Parker and NRCS representatives jointly inspected the failed areas. By that time, Parker had partially completed installation of the CCB system as required by the plans, specifications, and field changes ordered by NRCS.

27. By the end of October 2002, Parker had made two attempts to install the CCB system on the Project as originally designed and per the field changes directed by the NRCS.

28. Both attempts resulted in failure of the system, demonstrating that the design was unworkable and needed to be modified.

29. In a December 5, 2002 memorandum, NRCS Construction Engineer, Don Shanklin, provided an explanation of the significant CCB system design deficiencies, as well as the engineering reasons for the revisions that the NRCS implemented to correct the design.

30. Despite Parker's notice of design deficiencies in the CCB system on October 1, 2002, and NRCS witnessing the multiple failures to the CCB system, the NRCS did not alter the design until it issued Contract Modification No. 4 on January 10, 2003, 101 calendar days after Parker first notified the Government of the problem.

31. The NRCS issued Modification No. 4 requiring placement of topsoil over the entire CCB system and directing other design changes such as requiring a "sausage roll" configuration; requiring that placement of the topsoil not be further than 200' behind the installation of the blocks; specifying a less permeable limestone layer on the berm (walkway) to prevent water infiltration from the top of the substrate; and, changing the manner of placement of the geotextile from horizontal to vertical.

32. Compliance with Modification No. 4 required placement of additional topsoil that was not available in the NRCS designated borrow areas.

33. Parker experienced delay as the NRCS failed to: (a) designate a suitable borrow area for the additional topsoil in a timely manner; (b) negotiate the increased cost of the modification with Parker in a timely manner; and (c) otherwise direct Parker to proceed with the changed work.

34. As a result of the NRCS' design deficiencies and failure to timely issue a Contract modification, Parker incurred critical path delays and increased costs in attempting to install the CCB system in accordance with the NRCS specifications.

## C. The NRCS Failed to Coordinate and Designate Suitable Fill and Borrow Areas

35. Even after NRCS issued Modification No. 4, Parker continued to incur critical path delays and increased costs.

36. In a letter forwarding Modification No. 4 to Parker, the NRCS Contracting Officer requested Parker to submit a revised cost proposal for the changed work.

37. Modification No. 4 failed to identify the area from where Parker could obtain the additional topsoil required to execute the changes directed by NRCS. In the absence of this additional information, Parker could neither price nor begin performance of the changed work.

38. When NRCS provided the location from which Parker was to obtain topsoil for the changed work, the NRCS-designated Borrow area proved inaccessible for the Contract's topsoil needs.

39. Parker informed NRCS that the area identified for the new topsoil was a low area where topsoil was excessively wet and that it was impractical to use that material during the winter and spring months.

40. After Parker alerted the NRCS to the problems with the Government-designated borrow area, Parker received a "cure" notice from the NRCS Contracting Officer alleging that no work was being performed on the subject project "when site conditions are favorable to work."

41. Parker's progress updates, which were verified and approved by the NRCS, indicate that Parker's progress on the Project was ahead of schedule as of September 30, 2002.

42. As of September 30, 2002, Parker had completed approximately 91% of its Contract scope of work and this calculation did not include additional work that Parker already had performed.

43. Due to the inaccessibility of the Government-chosen borrow area, Parker's progress of work on the Project's critical path was delayed.

44. In addition to the delays stated above, a significant portion of the Contract scope of work entailed the excavation and placement of large volumes of soil to create the embankment of the dam.

45. The Contract Documents specified the locations and limits of each borrow area and the specific order in which these areas could be excavated.

46. During the course of excavation, Parker discovered differing site conditions in the Auxiliary Spillway ("ASW") and in Borrow Area A, which significantly impeded Parker's access to usable fill materials from these areas.

47. Parker discovered latent defects in the Contract Documents pertaining to Borrow Area 4, which resulted in a change in the excavation profile for this area and impeded Parker's access to usable fill materials as required for the dam embankment.

48. The NRCS hindered Parker's ability to progress the work by limiting Parker to only two Borrow Areas ("A" and "4") out of the nine Contract-designated borrow areas.

49. The fill material Parker could obtain from the ASW consisted of highly erosive, dispersive soils. Furthermore, a large portion of the ASW was a gravel pit, and the remaining portion did not yield enough topsoil to achieve the six-inch cover required in the ASW itself.

50. Parker notified the NRCS of these differing site conditions and requested additional locations to obtain clay and topsoil. The NRCS ignored these requests, notwithstanding the actual conditions encountered during construction.

51. The Contract Documents designated Borrow Area A as the first priority borrow area for embankment fill materials; however, by letter dated February 6, 2001, Parker notified

the NRCS that the area encompassed by Borrow Area A had been used in the past as an illegal landfill, and that the soils would not be suitable.

52. Borrow Area A contained concrete rubble, assorted discarded steel, household garbage, tires, medical IV bottles, medical IV needles, broken glass, and old crushed drums.

53. Despite notification to NRCS of the defects and differing site conditions in Borrow Area A, NRCS continued to direct Parker to excavate material from the ASW and Borrow Area A.

54. As a result of government actions and inactions, Parker incurred increased costs, including direct costs for standby labor and equipment, additional costs to monitor the condition of the borrow area, additional pollution control and cleanup costs, field overhead costs, and extended home office overhead costs, for which the NRCS is liable.

**D. The NRCS' Design Defects for the Dam Embankment Foundation Caused Parker To Encounter Excessive Settlement and a Differing Site Condition**

55. The Contract specifications represented that the Project design accounted for anticipated settlement.

56. The Contract specifications regarding settlement were misleading and incorrectly estimated the volume of fill material required for construction of the earthen embankment.

57 The design calculations included in the NRCS' pre-bid Soils Mechanics Report, which was not provided to Parker during the bid process, indicated significantly greater settlement than specified in the Contract.

58. Because the NRCS did not provide its soil report to Parker, the NRCS had superior knowledge regarding the expected settlement when it issued the solicitation, and did not share that knowledge with Parker.

59. The actual settlement experienced during construction; however, was even greater than the designers' estimate.

60. As a result of excessive settlement, Parker was required to increase the amount of fill material necessary to stabilize the embankment.

61. The Contract did not provide a method for measurement and payment of the additional fill material placed due to the excessive settlement.

62. Unanticipated, excessive settlement beyond that identified in the Contract documents caused Parker to encounter a differing site condition and required Parker to increase the amount of fill material necessary to stabilize the embankment, thereby incurring additional costs and delays.

**E. <u>The NRCS Provided Ineffective Erosion Control Measures</u>**

63. The NRCS Contract specified the pollution and erosion control activities that Parker was required to undertake.

64. The NRCS' specified pollution and erosion control measures were ineffective and inadequate for their intended purpose.

65. During performance, the NRCS also modified the Contract, which significantly altered and increased the scope of pollution and erosion control activities required on the Project.

66. The Contract identified the specific methods Parker was to employ to control pollution, including the construction of a silt fence and the use of straw bales.

67. Parker adhered to the contract's specifications for erosion and pollution control.

68. Despite Parker's adherence to the Contract requirements for erosion and pollution control, neither the silt fence nor the straw bales were sufficient to control pollution and sedimentation.

69. Following these failures, the NRCS directed Parker to seed and plant vegetation to control erosion; however, groundwater seepage continued to erode the soils.

70. Despite Parker's notice to NRCS regarding the groundwater seepage, the NRCS did not direct a change until after terminating Parker and the NRCS' changes to the erosion control methods were ultimately installed by another Contractor.

71. As a result of the NRCS' defective specifications with regard to erosion and pollution control, Parker incurred delays and extra costs for which NRCS is liable.

**F. <u>Parker Incurred Delays On The Project Due To Unusually Severe Weather Conditions</u>**

72. During performance of the Contract in 2000, 2001, 2002, and 2003, the NRCS failed and/or refused to grant time extensions for excusable delays due to unusually severe adverse weather, notwithstanding Parker's clear entitlement to such extensions.

73. The Special Contract Requirement, Paragraph H.7, titled "Time Extensions for Unusually Severe Weather" specifies the procedures for determining time extensions for unusually severe weather. Subparagraph H.6(c) requires that the evaluation be performed on a monthly basis and that qualifying delay days be converted to calendar days.

74. The NRCS ignored the monthly review requirements of Paragraph H.6 when it denied Parker's request for time due to adverse weather and relied instead upon the total number of weather delays permitted over the life of the Contract.

75. A proper monthly analysis of the weather delays indicates that Parker is entitled to a time extension for excusable and compensable delays on the Project due to unusually severe weather.

76. NRCS' failure to grant a time extension to Parker for unusually severe weather caused Parker to incur additional costs on the Project.

## G. Parker's Termination

77. On April 8, 2003, after Parker had completed approximately 93% of the Contract scope of work, NRCS improperly terminated Parker's Contract, allegedly for failing to make progress on the Project.

78. Almost a year after the termination of Parker's Contract, the NRCS re-procured the remaining portion of the Contract, incorporating among other changes, significant revisions to the CCB and other system designs.

79. Parker's wrongful termination was the subject of a suit previously filed in this court on March 23, 2004, titled J.H. Parker Construction Co., Inc. v. United States, No. 04-471.

80. In that suit, Parker sought to convert its termination for default into a termination for convenience.

81. The termination suit was resolved through a settlement with the Government by which the Government converted the termination to a termination for convenience and agreed that Parker could pursue claims for additional performance costs incurred.

## H. The NRCS Failed to Cooperate and Proceed In Good Faith

82. Despite the many notifications Parker provided to the NRCS regarding the Project's design defects, and despite that the NRCS acknowledged these defects, the NRCS failed to cooperate with Parker and delayed issuing any design changes or modifications, and indeed issued some changes only after the NRCS terminated Parker's Contract.

83. Parker notified the NRCS of design defects regarding the CCB system immediately after construction commenced; however, the NRCS delayed for months before issuing a change order and required Parker to construct the CCB using defective specifications.

84. Parker notified NRCS regarding the insufficient soils in the NRCS-designated Borrow areas; however, the NRCS required Parker to excavate fill material from the defective Borrow areas.

85. NRCS acknowledged during the Contract and afterward that the specifications were defective.

86. During discovery in the termination case before this court, Case No. 04-471, counsel for Parker took the deposition of Verlene Ratliff, the NRCS' Contracting Officer.

87. During her deposition, Ms. Ratliff acknowledged the design defects in the NRCS' specifications and testified as follows:

> Q: [Parker's Counsel] So how was it not a design defect if the sausage roll was needed if it wasn't in the design?
> A: [Ms. Ratliff] We made a change.
> Q: Right. And before you made that change, the design was defective, correct?
> A: Yes

88. Despite acknowledging that its specifications were defective, the Government's failure to cooperate with Parker continued during its handling of Parker's Certified Claim.

89. After the previous case was settled, on September 26, 2006, Parker submitted a Certified Claim to Ms. Ratliff requesting an equitable adjustment to the Contract price based on defective specifications, delays, and differing site conditions.

90. After the statutory sixty days had passed and no Contracting Officer's decision was issued, on December 1, 2006, Parker inquired as to the status of its claim.

91. On or about December 4, 2006, NRCS counsel informed Parker that the claim was never received and that no review had occurred whatsoever.

92. On or about December 5, 2006, NRCS found that Parker's claim had been timely delivered to the Government but that the Claim had been stored in a supply room. The Government then acknowledged that it had received Parker's Claim on September 26, 2006.

93. On or about December 6, 2006, Parker and the Government agreed that the NRCS would issue a Contracting Officer's decision within sixty-days of December 5, 2006.

94. On or about February 7, 2007, Parker contacted the NRCS to inquire as to when a Contracting Officer's decision would be issued.

95. On or about February 9, 2007, despite agreeing to issue a Contracting Officer's decision, NRCS' counsel informed Parker that no Contracting Officer's decision would be issued and that Parker's claim was deemed denied.

**COUNT I**

**(Breach of Contract, Defective Specifications and Changes)**

96. Parker incorporates by reference each and every allegation contained in Paragraphs 1-95 as if fully set forth herein.

97. The Contract between Parker and the NRCS required Parker to construct the Franklin County Dam in accordance with the designs, specifications and drawings provided by NRCS.

98. Based upon the foregoing requirement, NRCS warranted that the specifications were accurate, complete and free from defects.

99. Parker constructed the dam in accordance with the NRCS specifications.

100. Parker fully satisfied all of its obligations under the Contract including any conditions precedent to bringing this action.

101. During construction of the dam in accordance with NRCS' specifications, the dam encountered multiple failures.

102. In addition to the CCB failure, the project also suffered from and encountered excessive settlement, as well as improper erosion and pollution control elements.

103. The dam's multiple failures resulted from defects in NRCS' specifications and not as a result of any shortcomings in Parker's work.

104. Based upon NRCS' failure to provide specifications that were free from defects, NRCS breached its Contractual obligation as set forth in the foregoing paragraphs.

105. As a result of NRCS' design defects, Parker incurred delay damages and additional costs to reconstruct the dam in accordance with NRCS' new specifications.

## COUNT II

### (Breach of Contract, Differing Site Conditions)

106. Parker incorporates by reference each and every allegation contained in Paragraphs 1-105 as if fully set forth herein.

107. The Contract between Parker and the NRCS required Parker to construct the Franklin County Dam in accordance with the designs, specifications and drawings provided by NRCS.

108. The Contract between Parker and NRCS indicated the site conditions, soil and fill material, and subsoil conditions Parker would encounter during construction of the dam.

109. Based upon the indications in the Contract regarding site conditions, NRCS warranted that the information regarding the site condition and available fill material was accurate.

110. In the course of performance, Parker encountered soils and fill material in the NRCS specified Borrow areas that were unfit for their intended purpose and subsoil conditions that were materially different than indicated in the Contract documents.

111. The differing site condition resulted from defects in NRCS' specifications and not as a result of any shortcomings in Parker's work.

112. Based upon NRCS' failure to properly identify and designate proper Borrow Areas and the site conditions expected to be encountered, NRCS breached its Contractual obligation as set forth in the foregoing paragraphs.

113. As a result of encountering differing site conditions, Parker incurred delay damages and additional costs to complete the Project.

**COUNT III**

**(Breach of Duty to Cooperate and of Good Faith and Fair Dealing)**

114. Parker incorporates by reference each and every allegation contained in Paragraphs 1-113 as if fully set forth herein.

115. In the course of performing the Contract, NRCS owed a duty to Parker not to interfere with Parker's performance, to cooperate with Parker to address changes and issues with the Contract, and to undertake its actions with good faith and deal fairly with Parker.

116. Despite Parker's notice to NRCS of changes, differing site conditions and defects in NRCS' specifications, and despite that NRCS acknowledged that its design was defective, the NRCS failed to issue any design changes in a timely manner and required Parker to adhere to defective specifications.

117. In addition to the NRCS' lack of cooperation and good faith during Parker's performance on the Contract, the NRCS failed to cooperate and exhibited bad faith in the manner with which it handled Parker's Certified Claim.

118. Based upon NRCS' failure to cooperate or to proceed in good faith, NRCS breached its Contractual obligation as set forth in the foregoing paragraphs.

119. As a result of NRCS' breach, Parker incurred delay damages and additional costs to complete the Project.

WHEREFORE, Parker requests that the Court enter judgment in its favor and against the United States for an amount not less than $3,446,688.00, plus interest, attorneys' fees, costs, and any further relief the Court deems just and proper.

Dated: March 16th, 2007

Carter B. Reid
WATT, TIEDER, HOFFAR& FITZGERALD, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
Phone: (703) 749-1000
Fax: (703) 893-8029
E-mail: creid@wthf.com